## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CYNTHIA BARROW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| TOUCHETTE REGIONAL HOSPITAL, INC. | ) | |
| Serve: | ) | |
| ILLINOIS CORPORATION SERVICE C | ) | |
| 801 ADLAI STEVENSON DRIVE | ) | |
| SPRINGFIELD, IL 62703 | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Plaintiff, by her attorneys KENNEDY HUNT, P.C. and EQUIP FOR EQUALITY, and for her Complaint against Touchette Regional Hospital, Inc. states as follows:

### INTRODUCTION

1.      This matter arises under the Americans with Disabilities Act ("ADA") as amended, 42 U.S.C. § 12111, *et seq,* Section 504 of the Rehabilitation Act, 29 U.S.C. §794 (Section 504), and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. Ann. 5/1-101 *et seq.* Plaintiff was employed as a registered nurse by Defendant Touchette Regional Hospital, Inc. Defendant subjected Plaintiff to harassment and discrimination based on her disability, Multiple Sclerosis. Defendant, through its staff and supervisory employees, degraded, harassed, and humiliated Plaintiff. Defendant created a hostile work environment and forced her to take unpaid leave. Plaintiff opposed the conduct and repeatedly complained about unfounded writeups and discriminatory treatment. Plaintiff also filed an EEOC charge in the spring of 2019. On October 11, 2019, Defendant retaliated against Plaintiff and terminated her from employment.

1

## JURISDICTION AND VENUE

2.      Plaintiff invokes this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1343(a) to hear and decide claims under federal law. Plaintiff invokes supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear and decide Plaintiff's claims under Illinois state law.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and 42 U.S.C. § 2000e-5(f)(1)(B)(3) because all events giving rise to this action occurred within the Southern District of Illinois.

4.      On April 22, 2019, Plaintiff cross-filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") alleging disability discrimination and retaliation. On October 31, 2019, Plaintiff filed an amended charge. On August 7, 2020, Plaintiff received a Right to Sue letter from the EEOC. On October 23, 2020, the IDHR issued Plaintiff a notice allowing Plaintiff to commence a civil action within 90 days of Plaintiff's receipt of the notice. This action is filed within 90 days of receipt of both notices. Plaintiff has complied fully with the administrative exhaustion requirements of the ADA and the Illinois Human Rights Act.

## PARTIES

5.      Plaintiff Cynthia Barrow is a person who resides in St. Clair County, Illinois.

6.      Plaintiff is a person with a disability within the meaning of the ADA, 42 U.S.C. §§ 12102(1)(A) and (2)(A), and within the meaning of the IHRA, 775 ILCS 5/1-103(I). Plaintiff's disability is Multiple Sclerosis.

7.      At all relevant times, Plaintiff has been a qualified individual with a disability under Section 101(2) of the ADA, 42 U.S.C. § 12111(8).

8.      Plaintiff was an employee within the definition of the IHRA, 775 ILCS 5/2-101(A).

9.     Defendant Touchette Regional Hospital, Inc. is an Illinois business that has the capacity to sue and be sued. Its offices are located at 5900 Bond Ave, Centreville, IL 62207.

10.     Defendant operates a "program or activity receiving Federal financial assistance" under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

11.     At all relevant times, Defendant has continuously been an Illinois Corporation doing business in the State of Illinois and the City of Centreville, Illinois and has continuously had at least 15 employees, meeting the definition of an employer within the IHRA, 775 ILCS 5/2-101(B)(1)(c).

12.     At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce under Section 101(5) of the ADA, 42 U.S.C. § 12111(5), and Section 101(7) of the ADA, 42 U.S.C. § 12111(7), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C. §§ 2000e(g) and (h).

13.     At all relevant times, Defendant has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## STATEMENT OF FACTS
## COMMON TO ALL COUNTS

### I.     Background

14.     Plaintiff began working for Defendant Touchette Regional Hospital, Inc. ("Touchette") in July of 1992. Touchette hired Plaintiff as a unit secretary.

15.     Plaintiff made approximately $8.00 per hour at hiring.

16.     Shortly after her hiring, Plaintiff received her bachelor's degree in nursing.

17.     Shortly after, Defendant hired Plaintiff as a registered nurse for the outpatient psychiatric unit at Touchette. At that time, Plaintiff's job duties included speaking with patients,

evaluating patients to develop a care plan, reviewing patient medications, and monitoring the safety of patients.

18.     Plaintiff received several merit-based raises during her employment. By 2018, Plaintiff's salary was approximately $65,000.00 per year.

19.     In 2006, Plaintiff was diagnosed with Multiple Sclerosis ("M.S."). Plaintiff's diagnosis makes it difficult for her to ambulate. Plaintiff experiences numbness in her lower extremities and a "pins and needles" sensation in her legs and feet. Plaintiff experiences periodic relapses of her condition, which results in worsening symptoms.

20.     Shortly after receiving her M.S. diagnosis, Plaintiff disclosed her disability to Marsha Butler, her supervisor at the time, and Dr. Sulbrina Day, who worked in nursing administration. Plaintiff did not request nor require accommodations at that time.

21.     Plaintiff worked until 2018 without receiving any accommodations at work.

22.     In 2018, Dr. Day began to ask Plaintiff if she was doing "okay." If Plaintiff said she was doing okay or fine, Dr. Day questioned her as if that were impossible.

23.     By the summer of 2018, Dr. Day unilaterally decided Plaintiff needed to use a wheelchair at work because of her diagnosis.

24.     Dr. Day relayed her decision to Ms. Butler. Ms. Butler, and Plaintiff's supervisors who succeeded her, enforced the wheelchair requirement from that point forward.

25.     Plaintiff was able to use a walker and did not require the use of a wheelchair at this time.

## II.    Plaintiff's Leave

26.     In December 2018, Plaintiff experienced a relapse of M.S. which prevented her from moving her legs and feet.

27.     On or around December 10, 2018, Plaintiff saw her neurologist, who sent her to the hospital for IV steroids. Plaintiff was admitted to the hospital on or around December 10, 2018 and released from the hospital several days later.

28.     After her release, Plaintiff participated in an inpatient rehabilitation program until December 29, 2018.

29.     Plaintiff used her accrued available vacation and sick leave during this time.

30.     Touchette sent Plaintiff FMLA paperwork while she was in the rehabilitation program. Plaintiff completed the FMLA paperwork with the doctors at the rehabilitation facility and returned it to Touchette.

31.     Touchette approved Plaintiff's request for FMLA leave.

32.     Around that time, the nursing supervisor, Marsha Butler, resigned. Lisa Bicket, a social worker, began supervising Plaintiff. Plaintiff regularly called Ms. Bicket to keep her informed of her absences and health condition.

33.     Plaintiff spoke with Ms. Bicket on the phone when her rehabilitation was completed to let her know she was ready to return to work.

34.     Ms. Bicket told Plaintiff she needed to see the employee health doctor with Touchette before she could return to work.

35.     Plaintiff saw the employee health doctor on or around January 11, 2019. The doctor authorized Plaintiff to return to work on January 14, 2019.

36.     That same day, Plaintiff called her neurologist's office to confirm she was clear to return to work.

37.     On January 11, 2019 the neurology clinic sent a letter to Ms. Bicket indicating the Plaintiff was cleared to return to work with a wheelchair.

38.     Plaintiff needed an accommodation at work to use her wheelchair because her disability made it difficult for her to lift and use her legs and feet.

39.     Plaintiff also called Ms. Bicket on January 11, 2019 to inform her she would be returning to work.

40.     Ms. Bicket responded, "No, I don't think so." Ms. Bicket told Plaintiff she would let her know "later" what she would need to do to return to work.

41.     On January 29, 2019, Plaintiff received a letter in the mail from Touchette. The letter was dated January 11, 2019.

42.     The letter stated Plaintiff needed to obtain a doctor's note clearing her to return to work by January 28, 2019.

43.     Plaintiff had already provided a note from her neurologist approving her to return to work to Ms. Bicket. Defendant's employee health doctor had also approved her return to work. Plaintiff called Ms. Bicket to discuss the letter and her return to work.

44.     During that conversation, Ms. Bicket insisted Plaintiff needed to continue to take FMLA leave until she was cleared to return to work.

45.     Ms. Bicket said, "FMLA is good enough, you have time."

46.     Ms. Bicket ended the call by telling Plaintiff that she "didn't have anything else to say" and hung up the phone

47.     Plaintiff and her neurologist's office continued to send letters to Touchette indicating Plaintiff could return to work. Plaintiff also continued to call human resources and left several voicemails.

48.     In early February 2019, Plaintiff called Ms. Bicket about returning to work.

49.     Ms. Bicket told Plaintiff nobody wanted her at work and told her she needed to apply for disability. Plaintiff told her she was not going to be approved because her doctors cleared her to return. Ms. Bicket told Plaintiff to "apply anyway."

50.     . Plaintiff's FMLA leave ran out on or around February 28, 2019.

51.     Plaintiff was receiving no income, as Defendant had forced her on an unpaid leave, despite her being approved to return to work.

52.     Plaintiff's landlord sued her and she lost her apartment because she could not pay rent while not receiving an income.

53.     After losing her apartment, Plaintiff was forced to move into a hotel for several months.

54.     Sometime near the end of February 2019, Plaintiff's health insurance through Touchette lapsed and Plaintiff was without health insurance.

55.     Plaintiff wanted to return to work but Touchette would not let her return. Between January 9, 2019 and April 2019, the neurology clinic provided four letters to Touchette indicating Plaintiff was cleared to return to work.

56.     During the spring of 2019, Plaintiff filed an EEOC charge.

57.     On February 15, 2019, Paris Jackson, one of Plaintiff's coworkers, called Plaintiff and told her Ms. Bicket stated Plaintiff resigned. Ms. Jackson also told Plaintiff that Ms. Bicket cleaned out her office.

58.     Plaintiff e-mailed human resources to tell them she was not resigning.

**III.     Plaintiff's Return to Work**

59.     In late March or early April 2019, Amy Franzik, the safety director, set up a meeting to discuss Plaintiff's return to work.

7

60.     On April 2, 2019, Plaintiff met with Ms. Franzik and Kelly Green-Smith, the new director of human resources.

61.     During the meeting, Plaintiff asked why she could not return to work, and Ms. Green-Smith told her they wanted to be sure she was "okay" and "safe" to return.

62.     Ms. Franzik and Ms. Green-Smith told Plaintiff that Horizon Health merged with Touchette's psychiatric department during her absence, and Horizon Health eliminated her former position.

63.     Plaintiff was not made aware of any other structural changes within Touchette during her absence.

64.     During that meeting, Ms. Green-Smith told Plaintiff that she could apply for other positions and mentioned there was an opening for a clinical nursing position with Archview, an affiliate of Touchette. Plaintiff told Ms. Green-Smith she was interested in the Archview position. Plaintiff also reviewed the Touchette website to see if there were any other options available because Ms. Green-Smith did not confirm she would be guaranteed the Archview position during the meeting.

65.     Several weeks later, Ms. Franzik texted Plaintiff and told her she would be allowed to return to work on May 6, 2019. Ms. Franzik did not provide any details as to what Plaintiff would be doing or what position she would be in when she returned.

66.     When Plaintiff arrived at work on May 6, Ms. Green-Smith told her she would be "auditing files" instead of returning to a clinical position.

67.     During that conversation, Ms. Green-Smith told Plaintiff Touchette would no longer permit her to have patient contact because Touchette was unsure if Plaintiff was "safe."

68.     No one at Touchette explained to Plaintiff why it would be "unsafe" for her to have patient contact especially because she had successfully worked in the clinical setting for many years.

69.     Plaintiff did not receive a written job description or training for the file auditing position upon her return to work.

70.     During the time Plaintiff spent auditing files, her immediate supervisor was Mr. Lynn Lemke. As Plaintiff's supervisor, Mr. Lemke had the ability to terminate Plaintiff.

71.     Things became increasingly difficult for Plaintiff at work upon her return. Plaintiff's supervisors made it nearly impossible for her to do her job without harassment and humiliation.

72.     Plaintiff overheard Mr. Lemke discussing her with other employees several times. Plaintiff heard him make degrading comments about her such as, "I don't know why she's back here," "I don't know why she's trying to work, she's in a wheelchair!" and "Why is she even here?" to other employees.

73.     Eileen Stennis, one of the housekeepers, approached Plaintiff and told her she heard it as well.

74.     Plaintiff opposed those comments and told Mr. Lemke his actions were unprofessional.

75.     In response, Mr. Lemke told Plaintiff, "I'm sorry you think I was talking about you."

76.     Plaintiff also e-mailed Ms. Green-Smith about Mr. Lemke's comments. Ms. Green-Smith approached Plaintiff and told her, "He apologized, so we're not going to talk about this anymore."

IV.     **Hostile Work Environment and Retaliation**

77.     After Plaintiff's complaints, Mr. Lemke began to nitpick her performance.

78.     On July 23, 2019, Mr. Lemke and Cathy Bizette, the acting nurse manager, wrote Plaintiff up for "not performing her job duties" because she did not use a specific form he provided to complete audits.

79.     However, Plaintiff was unable to use the form because the computer program Touchette required her to use did not allow her to edit the form. Plaintiff complained to Mr. Lemke multiple times that the form did not work. He responded by telling her to "figure it out" and did not help her.

80.     In the meantime, Plaintiff completed the audits by hand, without using the form. Plaintiff explained this to Mr. Lemke during her write up, but he refused to look at the work she completed.

81.     After the write up, another employee, Stella Brockman, assisted Plaintiff in getting the form to work.

82.     The day after Mr. Lemke wrote Plaintiff up, Ms. Bizette told Plaintiff she needed to move out of her office, because the hospital was relocating her for "construction purposes."

83.     Ms. Bizette told Plaintiff to clean out her office immediately even though construction did not begin for another month.

84.     Ms. Bizette told Plaintiff she was not allowed to go through the inside of the facility to move because that would expose her to an upset patient in the hospital. The patient in question already received medication, calmed down, and had gone to sleep by the time Plaintiff needed to move, but she was still not allowed to go through the unit.

10

85.     Instead, Ms. Bizette told Plaintiff to roll her wheelchair all the way around the outside of the hospital to get to her new office.

86.     Plaintiff had to travel around nearly the entire hospital in her wheelchair to move offices. It was extremely hot outside, as it was late July, and moving was challenging and exhausting. At the time, Plaintiff was using a manual wheelchair because her automatic wheelchair was broken.

87.     When Plaintiff moved into the new office, she noticed it was labeled "storage."

88.     This experience was humiliating and unnecessary for Plaintiff.

89.     Once in her new office, Plaintiff's wheelchair did not fit in the nearest restroom. To demonstrate this, Plaintiff rolled her wheelchair into the restroom and showed Mr. Lemke how she could not close the door. Plaintiff then asked Mr. Lemke for an accommodation to be moved to an office with an accessible bathroom nearby.

90.     While in her new office, the only restroom that was large enough to accommodate Plaintiff's wheelchair was down a long hallway. To get to the restroom, she had to push open five heavy sets of double doors that were heavy and difficult to open. These doors did not have a button to automatically open.

91.     It was physically challenging for Plaintiff to open the doors from her wheelchair because the doors were extremely heavy and difficult to maneuver. To open them, Plaintiff had to hold one door with one arm and open the other door with her other arm while manually maneuvering her wheelchair through them both. Plaintiff's struggle to open the doors was so noticeable that other employees helped her open the doors.

92.     On more than one occasion, Plaintiff did not make it to the bathroom in time and urinated on herself. Plaintiff was too afraid to go home to change her clothes for fear of retaliation.

Around late July, Plaintiff again requested an accommodation by emailing Mr. Lemke and asking to be moved to another office to provide her with proper access to a restroom.

93.     In August 2019, Plaintiff received a steroid injection in her shoulder because of the physical strain of opening the doors to access the bathroom at work.

94.     The first week of August, Plaintiff provided Mr. Lemke and Kelley Green-Smith a letter from her doctor stating she was fit to return to work after being out of the office for the steroid injection.

95.      On August 6, 2019, when Plaintiff provided Mr. Lemke the letter, Plaintiff asked him why she needed to move out of her old office because the construction still had not started.

96.      Instead of answering the question, Mr. Lemke wrote Plaintiff up for being "insubordinate." Mr. Lemke told Plaintiff she was "too loud" and "should not speak to supervisory staff that way."

97.     In mid-to-late August 2019, Mr. Lemke changed Plaintiff's job duties from conducting audits to scheduling follow-up appointments for patients, a job that Plaintiff was overqualified for given her nursing degree and experience working in a clinical setting. Once again, Plaintiff did not receive a written job description. Mr. Lemke told Plaintiff to "focus on follow-ups" from that point on.

98.     Around the same time, the hospital moved Plaintiff's office again.

99.     This time, Plaintiff moved back into the office she occupied before her M.S. relapse in December of 2018.

100.     Plaintiff's old office had more noise and commotion, which made it difficult to hear people on the phone and concentrate. More employees worked in that part of the hospital, and

groups of employees frequently held meetings close to Plaintiff's office doors because it was located near an employee bulletin board.

101.    Plaintiff sometimes closed the office door to control the noise and to protect the privacy of the patients she spoke with on the phone.

### V.    Plaintiff's Termination

102.    In late September 2019, Nikki Lindsay, the nurse manager for inpatient behavioral health, told Plaintiff she and Lisa Bicket needed to meet with her about keeping her door closed.

103.    At that time, Ms. Bicket was no longer covering the nursing supervisor position. She was a social worker with no supervisory role over Plaintiff's position. Ms. Bicket had no experience in human resources at the hospital.

104.    Plaintiff told Ms. Lindsay she did not want Ms. Bicket to attend the meeting. In response, Ms. Lindsay told Plaintiff it was not about what she wanted.

105.    Plaintiff requested her friend and coworker, Paris Jackson, attend the meeting with her.

106.    During the meeting, Plaintiff tried to explain why she closed the door, but Ms. Lindsay refused to let her speak.

107.    Plaintiff was unaware of any open-door policy at Touchette. Ms. Lindsay did not tell Plaintiff it was against the rules to close the door. Instead, Ms. Lindsay could only tell Plaintiff it was what "she wanted."

108.    Ms. Lindsay issued Plaintiff a write up during the meeting.

109.    When Plaintiff requested a copy of the write up, Ms. Lindsay told Plaintiff she would receive a copy of it in thirty days if "she saw fit."

110.    Ms. Lindsay told Plaintiff she expected her to continue auditing files in addition to scheduling follow-up appointments.

111.    On October 11, 2019, Ms. Lindsay came to Plaintiff's office with Ms. Kelly Green-Smith and terminated her.

VIOLATIONS OF LAW

COUNT I:
The Americans With Disabilities Act - Discrimination

112.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

113.    Plaintiff is a person with a disability within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A). Plaintiff's diagnosis is Multiple Sclerosis ("M.S."). As a result of her M.S., Plaintiff is substantially limited in various major life activities, including walking and the major bodily function of the neurological system.

114.    Plaintiff was qualified to perform her job duties, as she could perform the essential functions of her position with or with or without an accommodation as evidenced by the fact that she successfully worked as a registered nurse for over twenty-five years with the same hospital.

115.    Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A).

116.    As described above, Defendant engaged in disability discrimination by forcing Plaintiff to take unpaid leave, by harassing Plaintiff and creating a hostile work environment, by failing to provide Plaintiff with a reasonable accommodation, by terminating Plaintiff, and by engaging in other discriminatory conduct in the terms and conditions of Plaintiff's employment, in violation of 42 U.S.C. § 12112.

117.    The violations of law described in this Count severely limited Plaintiff's opportunities and status on the basis of her disability, in violation of 42 U.S.C. § 12112.

14

118.    As a direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer lost wages and other economic benefits of employment, as well as emotional distress.

119.    As a direct result of Defendant's conduct, Plaintiff has incurred and will continue to incur attorney's fees, costs and other expenses in connection with this matter.

**COUNT II:**
**The Americans With Disabilities Act – Retaliation**

120.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

121.    Plaintiff is a person with a disability within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A).

122.    Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A).

123.    Plaintiff was qualified to perform her job duties and her disability was unrelated to her ability to perform her job duties.

124.    As described above, Defendant terminated Plaintiff from her position in retaliation for opposing and reporting discriminatory conduct and for filing a charge with the EEOC, in violation of 42 U.S.C. § 12203.

125.    As a direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer lost wages and other economic benefits of employment, as well as emotional distress.

126.    As a direct result of Defendant's conduct, Plaintiff has incurred and will continue to incur attorney's fees, costs and other expenses in connection with this matter.

**COUNT III:**
**Rehabilitation Act Section 504**

127.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

15

128.     Defendant operates a "program or activity receiving Federal financial assistance" under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

129.     Defendant violated Section 504, 29 U.S.C. § 794(a), by excluding Plaintiff "solely by reason of . . . her disability . . . from the participation in, be denied of the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Because Section 504 incorporates the standards of the ADA, this includes all allegations (without limitation, discrimination and retaliation) made above in Counts I-II. Plaintiff brings this claim under the procedures of 29 U.S.C. § 794a(a)(2).

## COUNT IV:
### The Illinois Human Rights Act - Discrimination

130.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

131.     Plaintiff is a person with a disability within the meaning of 775 ILCS 5/1-103(I). Plaintiff's diagnosis is Multiple Sclerosis ("M.S.").

132.     Plaintiff was an employee within the definition of the IHRA, 775 ILCS 5/2-101(A).Defendant is an employer within the meaning of the IHRA, 775 ILCS 5/2-101(B)(1)(c).

133.     Plaintiff was qualified to perform her job duties and her disability was unrelated to her ability to perform her job duties.

134.     As described above, Defendant engaged in disability discrimination by forcing Plaintiff to take unpaid leave, by harassing Plaintiff and creating a hostile work environment, by failing to provide Plaintiff with a reasonable accommodation, by terminating Plaintiff, and by engaging in other discriminatory conduct in the terms and conditions of Plaintiff's employment, in violation of the IHRA, 775 ILCS 5/2-102(A).

16

135.     As a direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer lost wages and other economic benefits of employment, as well as emotional distress.

136.     As a direct result of Defendant's conduct, Plaintiff has incurred and will continue to incur attorney's fees, costs and other expenses in connection with this matter.

### COUNT V
### The Illinois Human Rights Act - Retaliation

137.     Plaintiff is a person with a disability within the meaning of 775 ILCS 5/1-103(I). Plaintiff's diagnosis is Multiple Sclerosis ("M.S.").

138.     Plaintiff was an employee within the definition of the IHRA, 775 ILCS 5/2-101(A).

139.     Defendant is an employer within the meaning of the IHRA, 775 ILCS 5/2-101(B)(1)(c).

140.     Plaintiff was qualified to perform her job duties and her disability was unrelated to her ability to perform her job duties.

141.     As described above, Defendant terminated Plaintiff in retaliation for her opposing and reporting discriminatory conduct and for filing a charge with the EEOC, in violation of the IHRA, 775 ILCS 5/6-101(A).

142.     As a direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer lost wages and other economic benefits of employment, as well as emotional distress.

143.     As a direct result of Defendant's conduct, Plaintiff has incurred and will continue to incur attorney's fees, costs and other expenses in connection with this matter.

### PRAYER FOR RELIEF

144.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Touchette Regional Hospital, awarding lost wages and benefits, reinstatement, front wages, emotional distress damages, compensatory damages, pre- and post-

judgment interest, and attorney's fees and costs, as well as any other relief this Court deems may be just and proper.

**JURY DEMAND**

145.    PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE BY JURY.

Respectfully submitted,

*/s/ Sarah Jane Hunt*_____
Thomas E. Kennedy
Sarah Jane Hunt
MaryAnne Quill
Kennedy Hunt, P.C.
906 Olive St., Ste. 200
St. Louis, MO, 63101
314-872-9041 telephone
314-872-9043 fax
tkennedy@kennedyhuntlaw.com
sarahjane@kennedyhuntlaw.com
mquill@kennedyhuntlaw.com

Julie Meglan
Equip for Equality
906 Olive St., Ste. 200
St. Louis, MO, 63101
(312) 895-7207 telephone
(312) 800-0912 fax
JulieM@equipforequality.org

ATTORNEYS FOR PLAINTIFF